**SIGNED this 31 day of January, 2007.**

_____
**Marcia Phillips Parsons**
**UNITED STATES BANKRUPTCY JUDGE**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| In re<br>　　JAMES PAUL COLLIER,<br><br>　　　　　　　Debtor | No. 05-36576<br>Chapter 7 |
| DEBRA LINSTROTH<br><br>　　Plaintiff<br><br>v.<br><br>JAMES PAUL COLLIER<br><br>　　Defendant. | Adv. Proc. No. 06-3010 |

**M E M O R A N D U M**

APPEARANCES:

W. Tyler Chastain, Esq.　　　　　　　　　　Cynthia T. Lawson, Esq.
Bernstein, Stair & McAdams LLP　　　　　Bond, Botes & Lawson, P.C.
The Weston Building　　　　　　　　　　　5418 Clinton Highway
4823 Old Kingston Pike, Suite 300　　　　Knoxville, Tennessee 37912
Knoxville, Tennessee 37919　　　　　　　*Attorney for James Paul Collier*
*Attorney for Debra Linstroth*

**MARCIA PHILLIPS PARSONS**
**UNITED STATES BANKRUPTCY JUDGE**

In this adversary proceeding, the plaintiff Debra Linstroth seeks a judgment against the debtor James Paul Collier and a determination of nondischargeability under 11 U.S.C. § 523(a)(2)(A) and/or (6). The trial of this adversary proceeding was held on November 16, 2006. The record before the court consists of 67 exhibits introduced into evidence, along with the testimony of four witnesses, Debra Linstroth, James Paul Collier, Roy Braden and Charles Wright. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I).

I.

The debtor, who appeared to be about 30 years of age, testified that he had been framing houses since he was 13 years old when he began working summers for his uncle. Upon leaving high school in 1994, the debtor initially did cable work and subsequently returned to framing full time, usually working as a subcontractor along with his crew on construction projects. In May 2004, the debtor and the plaintiff met in the parking lot of an IGA supermarket, where the debtor and his family had stopped briefly while on their way to a horse show. Seeing the horses in the debtor's horse trailer, the plaintiff, a recent transplant to Tennessee, having moved here in 2003 from Wisconsin with her two minor daughters, introduced herself to the debtor and his family. When the debtor learned in their conversation that one of the plaintiff's daughters was a world champion rider, he asked about riding lessons for his own daughter and handed his business card to the plaintiff for her to write her phone number. Upon seeing that the debtor's business card referencing a construction business, the plaintiff told the debtor that she was interested in having a barn built. The debtor agreed to come out to her home to give her an estimate.

When the debtor visited the plaintiff at her residence, the plaintiff informed the debtor that there were several other projects that she would like to have done in addition to the construction of a barn, including the building of a room addition on her mobile home, a new deck, carport, and tack room, along with having her pasture bush-hogged, the cut-out and fencing of a horse arena, and the pouring of a concrete slab for a basketball goal. A few days later, the debtor gave the plaintiff an estimate of $53,230, but subsequently reduced the price to $39,820, upon the parties' agreement that the debtor would not be responsible for completing the inside of the room addition, which work would be done by a friend of the plaintiff.

To evidence their agreement, the debtor submitted to the plaintiff a written proposal from JPC Construction & Remodeling which both parties executed on June 7, 2004. According to the contract, the following work was to be performed:

> (1) 8 x 36 room addition on block piers lap siding on room addition and exposed trailor (sic). New roof across front, 1 3/0 x 5/0 window in addition and 1 patio door (customer will complete inside of room addition to include wiring, insolation (sic), sheetrock, carpet, and removal of trailor (sic) wall) (2) new driveway around house (3) new carport 24' x 12' on side of trailor (4) 24' x 36' barn with concrete floor with drain in wash room, T1-11 siding on outside and sawmill 1 x6 inside with 12' stall fronts, electrical including 6 lights and 2 outlets (5) new meter center for house pole (6) 10 x10 tack room with concrete floor T1-11 siding on outside unfinished on inside electric plugs and lights included (7) Bushhog pasture and fill in whole (sic) in pasture (8) Cutting out a 50' x 140' arena putting up wood fence around arena and installing 392' of wood fence around pasture installing 2 10' gates and one 3' gate (9) pouring a 15'x 15' slab for basketball goal.

The contract specified that "[a]ll work [was] to be completed in a workmanlike manner according to standard practices" for the sum of $36,720.00,[1] to be paid as follows: "$8,000.00 up front[,] in two to three weeks $15,630 to build barn, tackroom, and piers for addition[,] then in a month to 6 weeks an additional payment of $10,000.00 for room addition with the remainder of $3,080.00 to be paid upon completion."[2] The plaintiff paid $8,000.00 to the debtor on the day the contract was signed; $10,000.00 on June 17, 2004; $4,000.00 on July 13, 2004; and $14,320.00 on August 13, 2004.

At the time the parties entered into the contract, the debtor did not have a business license to operate in the name of JPC Construction & Remodeling and did not obtain one until June 9, 2004. In his deposition testimony, the debtor indicated that he obtained a business license in this name because one of the contractors for whom he was doing work gave him a check made out to JPC Construction and when he went to cash the check, the bank advised him that he had to have a business account in order to cash the check. The contract with the plaintiff was the first project on

---

[1] It was unclear to the court from the testimony why the contract price was $36,720, rather than the $39,820 amount that the debtor testified that the parties had orally agreed upon. The testimony did establish that the $39,820 amount was reduced by $1,000 because the plaintiff agreed to give the debtor a horse trailer she owned, although the trailer was never turned over to the debtor.

[2] The installment amounts total $36,710 instead of the $36,720 contract price.

3

which the debtor had estimated the entire cost of construction, although he had done other small remodeling jobs for family and friends.

The Monday after executing the contract with the plaintiff, the debtor brought his crew out to the plaintiff's home and worked continuously on the project until July 29, 2004, when the Knox County Building Codes Department issued a Stop Work Notice because no building permit had been obtained. A construction permit dated August 4, 2004 was subsequently issued but expressly stated that "[n]o modification of existing mobile home is allowed without sealed engineer design. No structure shall be supported by the mobile home."

The parties dispute what happened after that point. The plaintiff testified that when she gave the debtor the last installment of $14,320.00 on August 13, 2004, the debtor told her that he needed more time to complete the project as he would need the help of an architect to advise him how to complete the work on the room addition, but that he would still finish the project by the first of September. The plaintiff testified that the debtor refused her offer of more money, stating that he would take a loss on his own wages, simply working for free. The plaintiff testified that notwithstanding this conversation, she talked to the debtor very little thereafter and that he would not return her phone calls. She stated that the debtor was storing his horse at her house during this time and that he came to get his horse on the first of November, at which time he told the plaintiff that he was having trouble with his help and that if she found someone to finish the job, he would pay her back.

The debtor denied that he promised to complete the project by September or that the plaintiff offered him more money. According to the debtor, he told the plaintiff that he had underbid the project and that it was going to cost more than he had anticipated since the room addition could not be attached to the mobile home, but that he would still do the work at the contract price. The debtor testified that he told the plaintiff that he would need some time to come up with the money to complete the job. The debtor explained that, at the time, he had begun working part of his crew on a joint venture with an individual named King Moon, whereby he would build spec homes for Moon and the two would split the profits. The debtor stated that he had already started on one home for Moon that when finished would have given him a profit of about $22,500, more than enough to

4

complete the plaintiff's project, which he estimated would cost an additional $6,000 to $8,000 for trusses and labor for the room addition. The debtor testified that these plans went awry because all of his tools, worth about $36,000, were stolen from the job site and because Moon backed out of the joint venture with the debtor after the plaintiff complained to Moon about her dissatisfaction with the debtor's work. The debtor also testified that in late October or early November 2004, he was at a horse show with his family when his eight-year-old daughter ran into the plaintiff who directed the daughter to tell her father that he was "SOL" and that she would see him in court unless he was back at her house the next day to finish the work, which the debtor took to mean that the plaintiff was no longer willing to wait until he obtained the money to finish the job.

It is undisputed that the contract was never fully completed, although the parties dispute how much of the work the debtor completed. After the stop work order, the debtor continued to work on items under the contract other than the room addition, ultimately ceasing work entirely after the first of October when his tools were stolen. At that time, according to the debtor, the carport, driveway, horse arena, fence, and basketball goal were all completed; the tack room was complete except for shingles and electrical work; the barn was finished with the exception of installation of the stall fronts and the electrical work; and the room addition was about one-half complete—the walls were up and covered with blackboard, and the roof was on and covered with felt. The plaintiff, on the other hand, testified that while the debtor had completed the carport, the basketball court, and bushhogging, he had only put up some of the fencing and had only built a shell of a barn, causing her to have to pay a third party to complete the work. The plaintiff also testified that contrary to the terms of the contract, she had not specified any particular dimensions for the carport, only that it be large enough for both of her vehicles, and the finished carport does not meet this requirement. As for the improvements on the mobile home itself, the plaintiff admitted that the debtor had built the deck and had put in the flooring, walls, and roof framework of the room addition. She contended, however, that he had built the roof of the room addition three or four feet higher than the other room additions, that the block piers in the foundation were too far apart, and that due to the unfinished state of the room addition, rain leaked into the new room, causing the floor to buckle and mold to form in her mobile home. The plaintiff also testified that she had removed the skirting around her mobile home in order for the debtor to complete the deck and that without

5

the insulation, her water pipes froze and broke, causing damage to her home. The plaintiff also testified that the debtor had cut the gas lines to her swimming pool when putting in her driveway and that he never came back and repaired the damage.

On January 18, 2005, the plaintiff filed a complaint against the debtor in the Chancery Court for Knox County, Tennessee, seeking $50,000 in compensatory damages and alleging breach of contract and violations of the Tennessee Consumer Protection Act (the "State Court Litigation"). On October 12, 2005, the debtor filed for bankruptcy relief under chapter 7, thus staying the State Court Litigation, with the plaintiff initiating this adversary proceeding on January 13, 2006.

II.

The dischargeability of debts is governed by 11 U.S.C. § 523, which provides, in material part:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
>
> . . . .
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
> >
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition [or]
> >
> > . . . .
> >
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. § 523(a). The party seeking a determination of nondischargeability bears the burden of proving the necessary elements by a preponderance of the evidence, *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991), and § 523(a) is strictly construed against the plaintiff but liberally in favor of the debtor. *Rembert v. AT & T Universal Card Servs., Inc.* (*In re Rembert*), 141 F.3d 277, 281 (6th Cir. 1998); *Haney v. Copeland* (*In re Copeland*), 291 B.R. 740, 759 (Bankr. E.D. Tenn. 2003). The bankruptcy court possesses the jurisdiction and authority to adjudicate the plaintiff's claims and award any necessary damages, as measured by state law. *See In re Copeland*, 291 B.R. at 792 (citing *Longo v. McLaren* (*In re McLaren*), 3 F.3d 958, 965 (6th Cir. 1993)).

A. Nondischargeability under Section 523(a)(2)(A)

To satisfy § 523(a)(2)(A), the plaintiff must prove that the debtor obtained money, property, or services through material misrepresentations that he knew were false or that he made with gross recklessness, that the debtor intended to deceive the plaintiff, that the plaintiff justifiably relied on the debtor's false representations, and that the plaintiff's reliance was the proximate cause of her losses. *See In re Copeland*, 291 B.R. at 760 (citing *In re Rembert*, 141 F.3d at 280). First, the plaintiff must prove that the debtor engaged in conduct that was somewhat "blameworthy," and his fraudulent intent may be "inferred as a matter of fact" based on the totality of the circumstances. *In re Copeland*, 291 B.R. at 759 (citing *Commercial Bank & Trust Co. v. McCoy* (*In re McCoy*), 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001)). Material misrepresentations, omissions, and actual fraud all fall within the scope of § 523(a)(2)(A). *In re Copeland*, 291 B.R. at 759; *see also Mellon Bank, N.A. v. Vitanovich* (*In re Vitanovich*), 259 B. R. 873, 877 (B.A.P. 6th Cir. 2001) ("[A]ctual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions.").

> "False pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation [while a]ctual fraud "consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another–something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."

*In re Copeland*, 291 B.R. at 760 (quoting *Ozburn v. Moore* (*In re Moore*), 277 B.R. 141, 148 (Bankr. M.D. Ga. 2002) and *First Centennial Title Co. v. Bailey* (*In re Bailey*), 216 B.R. 619, 621 (Bankr. S.D. Ohio 1997)). *See also Peoples Sec. Fin. Co., Inc. v. Todd* (*In re Todd*), 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983) (For the purposes of § 523(a)(2)(A), "false representations and false pretenses encompass statements that falsely purport to depict current or past facts.").

> On the other hand,
>
> a broken promise to repay a debt, without more, will not sustain a cause of action under § 523(a)(2)(A). Instead, central to the concept of fraud is the existence of scienter which, for the purposes of § 523(a)(2)(A), requires that it be shown that at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation.

*EDM Mach. Sales, Inc. v. Harrison* (*In re Harrison*), 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003) (citations omitted). Intent to deceive requires proof that the debtor made false representations that

he knew or should have known would convince the plaintiff to provide property or services. *In re Copeland*, 291 B.R. at 765-66. "Fraudulent intent requires an actual intent to mislead, which is more than mere negligence. A 'dumb but honest' debtor does not satisfy the test." *In re Copeland*, 291 B.R. at 766 (quoting *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997)). Fraudulent intent may be inferred by examining the debtor's conduct to determine if he presented the plaintiff with "a picture of deceptive conduct . . . indicat[ing] an intent to deceive." *In re Copeland*, 291 B.R. at 766 (quoting *Wolf v. McGuire* (*In re McGuire*), 284 B.R. 481, 492 (Bankr. D. Colo. 2002)).

Finally, § 523(a)(2)(A) also requires justifiable reliance by the plaintiff; i.e., she must prove that she actually relied on the debtor's representations and that, based upon the facts and circumstances known to her at the time, such reliance was justifiable. *In re Copeland*, 291 B.R. at 767. Justifiable reliance can be found even if the plaintiff "might have ascertained the falsity of the representation had [s]he made an investigation." *In re Copeland*, 291 B.R. at 767 (quoting *In re McCoy*, 269 B.R. at 198).

In her brief, the plaintiff argues that the debtor materially misrepresented his expertise, skill, and ability with respect to the construction project by representing that he was a licensed general contractor and by falsely stating that he had the expertise to do the work, that he obtained the monies under the contract through said false representations and pretenses, that the plaintiff relied solely upon the debtor for performance under the contract, and that the reliance was the proximate cause of her losses, the incomplete renovation and the resulting damage to her home. The plaintiff also argues that the debtor's failure to apply for a business license prior to entering into the contract, his failure to maintain a construction account for her project, his failure to obtain a building permit prior to beginning work, his understatement of the costs of construction, his failure to procure engineering plans, and his representations that he was a licensed general contractor and that he was knowledgeable about Knox County Building Codes all support a finding of nondischargeability under § 523(a)(2)(A). With respect to the last payment of $14,320 made by the plaintiff after the Stop Work Notice had been issued, the plaintiff asserts in her brief that the debtor obtained this money by falsely representing that he would resolve the building code issues, obtain the engineer's drawings and complete the home, and that it is undisputed that these events never occurred.

Additionally, the plaintiff argues that the debtor used plaintiff's funds for projects other than hers and that such use is prima facie evidence of fraud under Tennessee law. Tennessee Code Annotated § 66-11-140 provides as follows:

> Such use of the proceeds enumerated in §§ 66-11-137 – 66-11-139[3] for any purpose other than either payment pursuant to written agreement between the parties or in accordance with the allocation of costs and profits under generally accepted accounting principles for construction projects shall be prima facie evidence of intent to defraud. Use of a single business bank account for multiple projects shall not be evidence of intent to defraud.

Tenn. Code Ann. § 66-11-140.

With respect to the latter argument as to the debtor's alleged improper use of funds, the evidence does not support this contention. At trial, the debtor submitted copies of cancelled checks totaling $28,263 which he testified were for materials and labor on the plaintiff's behalf. The debtor also testified that the difference between this amount and the sums paid him by the plaintiff was paid to himself for his own wages and profit. No evidence contradicted this testimony or otherwise indicated that the debtor had used the monies paid to him by plaintiff for a project other than the plaintiff's. Nor was there any basis for the assertion that the debtor acted fraudulently in failing to maintain a separate construction bank account for the plaintiff's work. Tenn. Code Ann. § 66-11-

---

[3] As it relates to this case, the statute implicated by the debtor's actions is § 66-11-138, which provides as follows:

> (a) Any contractor, subcontractor, or other person who, with intent to defraud, uses the proceeds of any payment made to that person on account of improving certain real property for any other purpose than to pay for labor performed on, or materials furnished by that person's order for, this specific improvement, while any amount for which such person may be or become liable for such labor or materials remains unpaid, commits a Class E felony.
>
> (b) Notwithstanding the provisions of subsection (a), there is no violation of this section when:
>   (1) Funds are disbursed pursuant to written agreement; or
>   (2) The use of funds received and deposited in a business account for use on multiple construction projects is based upon the allocation of costs and profits in accordance with generally accepted accounting principles for construction projects.

Tenn. Code Ann. § 66-11-138.

140 expressly provides that the use of a single business account for multiple projects is not evidence of intent to defraud. The debtor testified that he never represented to the plaintiff that he would segregate her money and no evidence contradicted this testimony.

As to the plaintiff's other assertions regarding fraud or misrepresentation, the evidence did not establish that the debtor intentionally or with gross recklessness misrepresented his expertise, skill, or ability in order to obtain monies from the plaintiff or that any statements or omissions were made with the intent to deceive the plaintiff. The court found the debtor credible when he testified that he did not tell the plaintiff that he was a general contractor, and the court does not find it likely that he would have done so inasmuch as it was not necessary for him to be hired by the plaintiff for the work. Furthermore, it appears that the debtor generally had the skills to do the work: he had spent most of his adult life framing as his means of making a living; he had completed decks and other small remodeling jobs for friends and family; and, in fact he testified that he could do the framing work in his sleep. Charles Wright, owner of Wright Construction Company, testified that the debtor had worked for him on one occasion framing houses and running a crew and that the quality of his work was always up to par and always in compliance with building code requirements. At the time the debtor and the plaintiff entered into the contract, the plaintiff's mobile home already had two room additions and the parties' discussion regarding the debtor's construction of a third additional room contemplated that the third room would be built just like the first two, attached to the mobile home. Unfortunately, although the debtor was a framing expert, he had never built an addition on a mobile home before and did not know that the building code regulations no longer permitted a room addition to be attached to a mobile home and that an addition has to be free standing such that the mobile home could be moved without affecting the addition.

Regarding the debtor's other failures cited by the plaintiff, this court is unable to conclude that either individually or collectively these alleged failures constitute fraud by the debtor. There was no evidence that the debtor represented to the plaintiff that he had a business license. Furthermore, the court notes that the plaintiff's first two checks to the debtor were written to him individually rather than to JPC Construction & Remodeling, which suggests knowledge by the plaintiff that the debtor did not initially have a business license in the name of JPC Construction. As to the debtor's failure to obtain a building permit, again the court finds credible the debtor's

10

testimony that he told the plaintiff that as owner of the property, she would be the party responsible for obtaining the permit.  With respect to the understatement of construction costs, the evidence did not establish that the debtor intentionally or with gross recklessness misrepresented the construction costs.  This was the first project on which the debtor had bid, and it appeared that the low price was not only a function of the debtor's lack of experience in estimating costs, but was also driven by his desire to help plaintiff whom he perceived as a new family friend with limited financial means.  The debtor testified that when he first quoted a price to the plaintiff, she indicated that the price was too high, that she was looking for a price in the neighborhood of $30,000 and that he felt sorry for plaintiff, a widow, raising two daughters alone and new to the area.

Regarding the debtor's failure to procure the assistance of an engineer or architect after receiving the last payment from the plaintiff, the evidence did not establish that the debtor falsely represented that he would obtain such assistance or that he made such representations with the intent to mislead the plaintiff.  While the debtor did mention the necessity of obtaining such drawings at the time he received the check, the evidence did not indicate that he told the plaintiff that he would use the money for that purpose.  To the contrary, the debtor told the plaintiff that he had labor and material bills outstanding that needed payment, and it was undisputed that $10,000 of the $14,320 amount was already past due under the contract.

Moreover, the court is convinced from a consideration of all the evidence that the debtor fully intended at the time he received the last payment and at the time of the representations to consult an expert and completely finish all of the work under the project as soon as he raised the money.  On September 22, 2004, the parties, at the debtor's request, met with Wayne Williamson of the Knox County Codes Department at the plaintiff's home in order for Williamson to explain the building permit's directive regarding the attachment of the room addition to the mobile home. Until his tools were stolen, the debtor continued working on the rest of the project while he attempted to raise the money to finish the room addition.  Even after the plaintiff commenced legal proceedings against the debtor, the debtor met on two occasions with the plaintiff and the parties' counsel at the plaintiff's home with a representative from the Knox County Building Codes, seeking to determine what could be done to salvage the construction.

The bottom line is that this is not a case of fraud or false pretenses. The court is convinced that the debtor was honest in his dealings with the plaintiff and would have been able to generally complete the project to the plaintiff's satisfaction if he had bid the project at a higher price or if had simply been able to attach the new room addition to the mobile home as the other two rooms were attached. The inability to do so put the project outside the debtor's expertise and beyond the price agreed upon by the parties. While the debtor may have been negligent in not checking the building codes before entering into the contract or without doing further investigation to ensure that the quoted price was adequate to complete the task, his negligence and failures do not rise to the level of gross recklessness because he had a factual basis for his misunderstanding: there were already two room additions attached to the mobile home and the debtor had previously demonstrated efficiency in framing jobs.

Furthermore, as previously mentioned, the debtor appeared as much motivated by a desire to help the plaintiff as he was to earn a profit. It was clear that during the time he worked on the project, the debtor viewed the plaintiff as a family friend, even feeding her horses while she was out of town and fixing her car during this same time period. Even though the plaintiff may have been a victim of the debtor's lack of expertise as to mobile home requirements and his lack of experience estimating building costs, she was not a victim of fraud.

### B. Nondischargeability under Section 523(a)(6)

The plaintiff also avers that her debt is nondischargeable under § 523(a)(6), which addresses "willful and malicious" injuries. In order to be successful under this subsection, the plaintiff must prove, by a preponderance of the evidence, the existence of "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 977 (1998); *Grogan v. Garner*, 498 U.S. at 291 (burden of proof in nondischargeability actions). In other words, the debtor must have either desired to cause the consequences of his actions, or he believed with reasonable certainty that such consequences would occur. *Markowitz v. Campbell* (*In re Markowitz*), 190 F.3d 455, 464 (6th Cir. 1999); *Guthrie v. Kokenge* (*In re Kokenge*), 279 B.R. 541, 543 (Bankr. E.D. Tenn. 2002). In the Sixth Circuit, unless the actor desires to cause consequences of his act or believes that the consequences are substantially certain to result from it, he has not committed a "willful and malicious injury" within the meaning

12

of § 523(a)(6). *In re Markowitz*, 190 F.3d at 464; *In re Kokenge*, 279 B.R. at 543.

There was no evidence that the debtor deliberately or intentionally injured the plaintiff or that he believed with substantial certainty that the plaintiff would be injured by his actions. To the contrary, the evidence established that the debtor intended to fully perform the contract when the parties entered into it and when the debtor accepted the final payment in August 2003. While the debtor did undeniably breach the contract by failing to finish the project, mere breach is insufficient to constitute a willful and malicious injury. *See Steier v. Best* (*In re Best*), 109 Fed. Appx. 1, 82004 WL 1544066, at *6 (6th Cir. 2004) ("[W]e have held that a breach of contract cannot constitute the willful and malicious injury to trigger § 523(a)(6).").

Nor did the debtor's failure to complete the job indicate a deliberate attempt by the debtor to injure the plaintiff. Initially, the failure resulted from the fact that the debtor's tools were stolen and the debtor's anticipated source of income was eliminated when Moon terminated his relationship with the debtor. Thereafter, not only did the absence of funds continue, but the debtor, according to his testimony, believed that, due to the plaintiff's conversation with the debtor's daughter followed a couple months later by plaintiff's commencement of legal proceedings against the debtor, the plaintiff no longer wanted him to personally complete the project and that he simply would be responsible for reimbursing the plaintiff for the costs she incurred in doing so. Moreover, the failed business venture with Moon left the debtor with several business debts, and, according to the debtor, his subsequent bankruptcy filing was due to pressure from these creditors who were demanding immediate payment. Thus, rather than the result of any intentional injury by the debtor to plaintiff, the plaintiff's damages were ultimately caused by financial setbacks beyond the debtor's control, even though initially begun by the debtor's own lack of expertise and knowledge. These facts are insufficient to support a finding of nondischargeability under § 523(a)(6).

### III.

Based on all of the foregoing, any debt owed by the debtor to the plaintiff will not be excepted from discharge under either § 523(a)(2)(A) or § 523(a)(6) of the Bankruptcy Code. As such, it is not necessary for this court to determine the extent of the plaintiff's damages. The court will enter an order consistent with this memorandum opinion.

# # #

14